IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARIA RENEE LOGAN, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-20-1444 |
| ESTES ENVIRONMENTAL, INC., | * | |
| Defendant. | * | |

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Estes Environmental, Inc.'s ("Estes") Renewed Motion for Summary Judgment. (ECF No. 48). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons set forth below, the Court will grant the Motion in part and deny it in part.

### I.  BACKGROUND

From July 23, 2007 until January 11, 2019, Plaintiff Maria Logan worked for Estes as an office manager and accounting coordinator. (Compl. ¶ 1, ECF No. 1). Logan's then-husband, Lawrence Meister, worked at Estes as the Vice President of Operations. (See Dep. Kimberly Barber ["Barber Dep."] at 54:13−20, ECF No. 56-6). When Logan interviewed with Estes, she informed Kimberly Barber, Estes President and Owner, of her Carpal Tunnel Syndrome ("CTS"). (Decl. Maria Logan ["Logan Decl."] ¶ 4, ECF No. 56-3). She also told Barber that she had a surgery scheduled related to her CTS which would require her to take two weeks off soon after the position began. (Id. ¶ 7). After the interview, Barber drafted a "job description" for Logan which detailed job duties, requirements, and the job

schedule. (Estes Job Description at 1, ECF No. 56-5). Logan asserts in her affidavit that this job description was not advertised publicly and was written with Logan's disability in mind. (Logan Decl. ¶ 8). Specifically, she attests that she had an agreement with Barber to work in the office three days a week as opposed to four days a week as specified in the job description. (Logan Decl. ¶ 10; see Estes Job Description at 1). On the other hand, Estes claims that the description was not related to any request for a disability accommodation. (Defs.' Mem. Supp. Renewed Mot. Summ. J. ["Mot."] at 3, ECF No. 48-1).

During her employment with Estes, Logan requested and was provided with other accommodations related to her job function including an ergonomic keyboard, a wireless mouse for both computers that she used, an automatic electric stapler, special easy flow pens, and a smaller cell phone that was easier for her to grip. (Logan Decl. ¶¶ 11−13). Additionally, Logan's requests to work from home and at varied hours in consideration of her disability, and alter her work schedule to accommodate doctor's appointments, were also met. (Id. ¶¶ 15−16). The first time that Logan alleges Barber failed to accommodate such requests was in 2012 after Logan incurred multiple absences due to stomach issues and dental surgeries. (Id. ¶ 15). However, Logan states that although Barber did not accommodate her requests during the time, Barber later told Logan that "she didn't mean to add pressure and that it did not matter to her when [Logan] was at the work office [versus] the home office as long as [she] took care of employee needs." (Id.). Logan also claims that because Barber was aware of her CTS, Barber would at times reassign some of Logan's responsibilities when her condition interfered with her ability to work, in addition to opening water bottles for her, carrying heavy boxes for her, and offering to drive Logan

when they traveled together because Barber knew that Logan's condition made these tasks difficult to perform. (Id. ¶¶ 18, 22).

Throughout her time at Estes, Logan completed self-evaluation reports where she discussed how her disability affected her job performance including experiencing physical pain and insomnia that resulted from carrying-out some of her assignments at work. (Logan Self Evaluations at 2, ECF No. 56-24). Barber also conducted performance reviews with Logan where Logan discussed how her productivity was affected by her disability. (Logan Decl. ¶ 20). In her personal communications with Barber, Logan shared details about her disability, on one specific occasion writing in an email addressed to Barber that her "neck and arm pain [were] off the charts." (Personal Communications at 4, ECF No. 56-13). While Logan's disability was often discussed with Barber both formally and informally, Logan claims that she was never asked by Barber to provide any documentation related to her CTS. (Logan Decl. ¶ 21).

According to Logan, throughout her time at Estes, she developed a personal relationship with Barber and considered her a close friend. (Id. ¶ 23). The two had conversations about their families, went shopping, attended parties, and took a trip to Atlantic City together. (Id. ¶¶ 23–24). Barber even sent Logan a birthday card that read, "Our best friendships are the ones we want to hang on to forever. Happy Birthday to my Forever Friend." (Personal Communications at 1–2). On the same card, a personal note was written which read, "I love you!! Happy Birthday! Love, Kim." (Id. at 2).

However, Logan claims that their personal and professional relationship suffered when Meister, Logan's then husband, began divorce proceedings against her in August

3

2018. (Logan Decl. ¶¶ 25–35). Logan states in her affidavit that during this time Barber assigned Logan extra work, stopped accommodating her requests to work from home, and required her to be at the office at 10:00 a.m., as opposed to the agreed upon 11:00 a.m. (Id. ¶ 30; Pl.'s Opp'n Mot. Summ. J. ["Opp'n"] at 5, ECF No. 56). When Barber informed Logan about this new schedule, she also asked Logan if this time was agreeable, to which Logan responded that it was and that she might need a couple of days to adjust. (See Excerpts Logan Dep. ["Logan Dep."] at 10:4−11, ECF No. 56-2).

Logan also complains that on one occasion, she asked Barber for permission to leave the office and work from home due to pain. (Id. at 10:12−14). In response, Barber informed Logan that instead of working from home, she could use a vacation day. (Id. at 10:15−16). Around this time, Barber also informed Logan that she expected her to be in the office Wednesday through Friday for the entirety of the workday – a change from the flexibility she was previously afforded to work from home. (Id. at 11:16−18).

In addition to the workload, schedule, and accommodation changes that Barber implemented with Logan, Logan began to experience harassment from her ex-husband in the workplace. (Logan Decl. ¶ 36). She claims Meister interfered with her work production and schedule, caused her emotional distress, made her feel fearful and isolated in the office, and prohibited cooperation from coworkers. (Id. ¶ 37). According to Logan, Meister harassed her because he wanted her to quit and look bad in front of other Estes employees, including Barber. (Id.; Logan Dep. at 31:8−11). On one occasion, Logan alleges that Meister entered her workspace and left his wedding ring on her desk to upset her. (Logan Decl. ¶ 41). On another occasion, Meister brought his girlfriend, who was unaffiliated with

Estes, to the workplace where she wrote a note on the office whiteboard that Logan later saw. (Barber & Attorney Emails at 1, ECF 48-9; Logan Decl. ¶ 43). Logan further alleges that Meister yelled at her in her office for complaining to Barber about this behavior. (See Logan Decl. ¶ 46).

After Logan made several complaints, Barber asked her to submit an official statement about Meister's alleged harassment in November of 2018. (Nov. Emails at 1−2, ECF 48-10). However, Logan informed Barber that she did not want to make a formal complaint and that her prior communications about Meister's behavior were made to "enlighten" Barber about his actions and elicit her cooperation in the matter. (Id. at 1). Barber later informed Logan that she would follow up with her about Meister's behavior after the holidays, but ultimately never did. (Logan Decl. ¶ 52; see Emails between Logan and Barber at 11, ECF 56-19).

On January 11, 2019, Estes terminated Logan. (Termination Letter at 1, ECF 56-21). Estes claims that Logan was terminated because she consistently caused disruptions in the workplace and to Barber's workday following her separation from Meister. (Mot. at 2). Specifically, Estes claims Logan regularly took up substantial amounts of Barber's time during the workday to discuss matters unrelated to work and specifically related to her divorce. (Id.).

Throughout her tenure with Estes, and including during the events in question, Logan claims that she never received any verbal or written warnings as part of the company's progressive disciplinary policy. (Logan Decl. ¶¶ 61, 65–67). Logan also claims that Barber never approached her regarding her behavior or communicated to Logan that

she did not want to discuss Logan's ongoing martial issues. (Id. ¶ 68). However, in communications with an attorney, Barber wrote in one email that she told Logan that "her personal issues are confidential and [she did] not need or want to be involved or made aware of them." (Barber & Attorney Emails at 1).

Logan, representing herself at the time, filed a form Complaint against Estes on June 19, 2020. (ECF No. 1). She alleges: discrimination on the basis of gender and disability under Title VII of the Civil Rights Act of 1964, Title 20, Subtitle 6 of the State Government Article of the Annotated Code of Maryland, and the Americans with Disabilities Act ("ADA"); failure to accommodate her disability under the ADA; retaliation for making multiple complaints of harassment against Meister and for asserting her rights to reasonable accommodations for her disabling condition; and withholding of earned time off in violation of the Maryland Healthy Working Families Act ("MHWFA"). (ECF No. 1). Estes filed an Answer on August 21, 2020, (ECF No. 8), and later moved for judgment on all claims on January 13, 2022, (ECF No. 48). Logan filed an Opposition on February 4, 2022, (ECF No. 56), and Estes filed a Reply on February 23, 2022, (ECF No. 60).

## II.   DISCUSSION

### A.   Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant "must set forth specific facts, either by affidavit or other evidentiary showing, demonstrating a genuine dispute for trial." Sanchez Carrera v. EMD Sales, Inc., 402 F.Supp.3d 128, 144 (D.Md. 2019). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)). A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera,

7

249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248.

If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Fed.R.Civ.P. 56(c)). Thus, summary judgment is warranted if the nonmovant does not provide evidence to establish an essential element of the case. Brocious v. U.S. Steel Corp., 429 F.Supp.3d 82, 86 (D.Md. 2019).

**B.     Analysis**

The Court's analysis in this matter is somewhat complicated by the fact that the only Complaint in this case was filed by Logan pro se. Although counsel later entered his appearance, no amended complaint was filed. The Court will set forth the claims as it understands them and as apparently agreed by counsel in their memoranda. In essence, Logan asserts she was fired because of her gender (female) and her disability (CTS); she was denied reasonable accommodations for her disability; and she was retaliated against for protected activity related to both her disability and her gender. (See generally Compl.).

**1.     Discrimination Claims**

**a.     Gender Discrimination under Title VII and Title 20**

Estes contends it is entitled to summary judgment as to Logan's claims for gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et

8

seq. ("Title VII") and under Title 20, Subtitle 6 of the State Government Article of the Annotated Code of Maryland ("Title 20"). Title 20 is the state law analog to Title VII. Cohens v. Md. Dep't of Hum. Res., No. WDQ-11-3419, 2012 WL 1712151, at *4 n.14 (D.Md. May 11, 2012), amended on reconsideration in part, 933 F.Supp.2d 735, 739 n.14 (D.Md. 2013). Maryland courts routinely look to Title VII cases to determine a defendant's scope of liability under Title 20 of the Maryland Code. Flood v. Univ. of Md. Med. Sys. Corp., No. GLR-12-2100, 2014 WL 7363237, at *5 (D.Md. Dec. 23, 2014). Because Logan's Title 20 claims parallel her Title VII claims, the court will analyze both claims under Title VII.

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII claim "either 'through direct and indirect evidence of retaliatory [or discriminatory] animus,' or through a burden-shifting 'pretext' framework." Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018) (quoting Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015)).

Logan's Complaint does not include allegations of direct evidence of discrimination. See Cole v. Fam. Dollar Stores of Md., Inc., 811 F.App'x 168, 175 (4th Cir. 2020) ("Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" (quoting Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir. 1999) (en banc))). Accordingly, the Court will evaluate her claims under the burden-shifting

framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

To establish a discrimination or retaliation claim under the McDonnell Douglas burden-shifting framework, Logan must put forth a prima facie case by establishing that:

> (1) [s]he belongs to a protected class;
> (2) [s]he suffered an adverse employment action;
> (3) at the time of the adverse action, [s]he was performing his job at a level that met [her] employer's legitimate expectations . . . ; and
> (4) [s]he was rejected [or terminated] under circumstances giving rise to an inference of unlawful discrimination.

See Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011).

Once the complaining party succeeds in his or her initial burden of establishing a prima facie case of discrimination, the burden shifts to the employer to assert a "legitimate, non-discriminatory reason," that does not deny equal protection, for its actions. See McDonnell Douglas, 411 U.S at 802. If the employer's reasons are acceptable, the plaintiff must show pretext for discrimination based on gender. See id.

Here, Logan asserts that she was fired because of her gender and for complaining about Meister's harassment. (Compl. ¶ 14). Estes, however, asserts that Logan has failed to meet the third element of the test. (Mot. at 8). At bottom, considering the evidence presented in the record, the Court finds that Logan has made a prima facie case of discrimination.

Logan showed satisfactory performance for the entirety of her tenure at Estes. Indeed, "[i]n the [almost] 12 years that Ms. Logan was employed by Estes, she never received a negative evaluation, nor was she ever disciplined." (Compl. ¶ 12). "Logan was highly regarded at Estes, [and] received numerous compliments [and salary increases] from

Ms. Barber for her performance." (Id.; see also Logan Performance Reviews at 1–14, ECF 56-30). This satisfactory record extended to the period during which Estes claims Logan caused tension and disruption in the workplace. Despite such claims, Logan was never given any sort of verbal or formal written warning, in compliance with company policy, that would have put her on notice of her unsatisfactory job performance. (Opp'n at 27; see Estes Disciplinary Docs. at 49, ECF 56-27). Importantly, on August 7, 2018, just weeks before Logan first approached Barber about the alleged harassment, she received a salary increase and was thanked by Barber for being an essential part of the Estes team. (Logan Performance Reviews at 13).

Because the Court has determined that Logan established the third element of a prima facie case of discrimination and there is no dispute regarding the other factors, the burden shifts to the employer to assert a legitimate, non-discriminatory reason for its actions. Estes argues that Logan failed "to meet [the company's] expectations with regard to her work [and] her actions . . . interfered with other staff members' completion of their work." (Mot. at 8). More specifically, Estes asserts that Logan's "actions surrounding her divorce from . . . Meister was causing tension and disruptions in the workplace and required [] Barber to address these disruptions on a daily basis." (Id.). However, the Court finds that the same facts that make out a prima facie case create a dispute of fact about the true reason for Logan's termination.

Furthermore, Logan's friendship with Barber creates a genuine dispute of material fact as to whether Barber considered her communications to be disruptive. Barber and Logan were accustomed to sharing details of their personal lives with one another. The two

discussed their families, went on vacation with one another, and even attended parties together. On Logan's birthday, Barber wrote a personal note to Logan which read, "I love you!! Happy Birthday! Love, Kim." (Personal Communications at 1). This evidence seems to indicate that Barber had established a friendship with Logan where it certainly would have been reasonable for Logan to feel that she could approach Barber about her divorce and about Meister's alleged harassment.

There is also sufficient evidence showing that the firing was based on gender. Although there is no evidence of direct discrimination, the disparate treatment of Logan and Meister suggests discriminatory intent in Logan's firing. Plaintiffs intending to rely on comparator evidence must show that they are similarly situated with a comparator "by showing that they both (1) 'dealt with the same supervisor,' and (2) were 'subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Tinsley v. City of Charlotte, 854 F.App'x 495, 500–01 (4th Cir. 2021) (quoting Haynes v. Waste Connections, Inc., 922 F.3d 219, 223–24 (4th Cir. 2019)). Here, Logan and Meister both reported to Barber and caused workplace disruptions due to their divorce. (See Barber Dep. at 44:12–21). Meister was not disciplined or fired even though Barber received numerous reports that he was in engaged in significant harassing activities. (Id. at 44:15–21, 45:1–4).

In sum, the totality of the evidence suggests that summary judgment on this claim is premature because the record casts doubt on the Estes's proffered explanation for Logan's termination and suggests that there is still a genuine dispute of material fact.

12

Accordingly, Estes's Motion for Summary Judgment on the gender discrimination claims under Title VII and Title 20 will be denied.

### b. Disability Discrimination under the ADA and Title 20

Logan claims discrimination on the basis of her disability under the ADA and Title 20. Maryland courts routinely look to federal law to determine a defendant's scope of liability under Title 20 of the Maryland Code. See, e.g., Carrier v. VCA Animal Hosps., Inc., No. DKC-11-129, 2012 WL 3536758, at *8 (D.Md. Aug. 13, 2012) (applying federal law in determining Title 20 liability for disability discrimination). Logan's Title 20 claims parallel her ADA claims, and as a result the court will analyze both claims under the ADA.

To establish a claim for disability discrimination under the ADA, a plaintiff must prove "(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 579 (4th Cir. 2015) (quoting EEOC v. Stowe–Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir.2000)). Disability discrimination may be proven through direct and indirect evidence or through the McDonnell Douglas burden-shifting framework. Id.; see Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.11 (4th Cir. 2001).

Estes concedes that Logan has a disability. (See Reply at 5 n.1, ECF No. 60). In considering the second factor, the facts which make out a prima facie case for gender discrimination under Title VII and Title 20 apply here. Logan's positive evaluations throughout her tenure at Estes and the absence of any warning or progressive discipline in the record suggests that she was qualified for the employment in question. As to the last

factor, Logan's comparator evidence concerning Meister creates a genuine dispute of material fact as to the reason for Logan's termination. The divorce and subsequent "disruption" in the office that Estes attributes to Logan involved two people – Logan and Meister. Nevertheless, Meister was not disabled and was not disciplined or fired despite Barber receiving numerous reports that he was in engaged in harassment. The Court therefore finds that a reasonable jury could conclude that Logan has established each element of a prima facie case of disability discrimination.

Under the familiar McDonnell Douglas framework, the burden then shifts to Estes to produce evidence of a legitimate, non-discriminatory reason for terminating Logan. Jacobs, 780 F.3d at 575. Estes offers the same non-discriminatory reasoning set forth above alleging that Logan failed to meet company expectations and was disruptive. (Mot. at 9). But, again, the totality of the facts that make out a prima facie case create a dispute of fact about the true reason for Logan's termination. There is evidence that Logan was never put on notice about her alleged unsatisfactory job performance and evidence regarding her friendship with Barber which suggests that Barber would not have found Logan to be disruptive. Accordingly, the justifications asserted by Estes may be pretextual and the Court will deny Estes's Motion on the disability discrimination claims under the ADA and Title 20.

2.   **Retaliation under Title VII, the ADA, and Title 20**

Logan claims that 1) she was terminated in retaliation for making multiple complaints of harassment against Meister, and 2) she was terminated in retaliation for asserting her rights to reasonable accommodations for her disabled condition. (Opp'n at

27). Estes asserts that it is entitled to summary judgment as to these claims under Title VII, the ADA, and Title 20. (Mot. at 12–14). Because Maryland courts routinely look to federal law to determine a defendant's scope of liability under Title 20 of the Maryland Code, the analysis will be the same.

To succeed on a claim of retaliation under the ADA, a plaintiff must first establish a prima facie case showing "(1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action." Rhoads, 257 F.3d at 392. The same analysis follows for claims of retaliation under Title VII. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).

With respect to Logan's claim regarding retaliation for asserting her rights to reasonable accommodations for her disabling condition, Estes argues that Logan did not engage in protected activity. The Court agrees. Protected activity may be classified as "participation" or "opposition." 42 U.S.C. § 2000e-3(a). Participation includes making a formal EEOC charge. Opposition includes speaking up against an employer's discriminatory activity. See Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998) ("Opposition activity encompasses utilizing informal grievance procedures . . . and voicing one's opinions in order to bring attention to an employer's discriminatory activities."). Logan has failed to show that she engaged in protected activity classified as either participation or opposition. Logan did not make a formal EEOC charge, nor did she speak up against her employer's discriminatory activity. In fact, when Barber informed Logan that she wanted her to be in the office by 10:00 a.m., Logan informed her

15

that this change in her schedule was acceptable. (Logan Dep. at 10:4−11). As such, Logan fails to establish that she engaged in protected activity.

With respect to Logan's claim alleging retaliation for making multiple complaints of harassment against Meister, the claim is somewhat closer but ultimately Logan fails to meet the first element of the test and thus fails to establish a prima facie case. "Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'" Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 122 (4th Cir. 2021) (quoting Balazs v. Liebenthal, 32 F.3d 151, 159 (4th Cir. 1994)). While Logan made informal complaints to Barber regarding the harassment she endured, her complaints did not allege discriminatory practices within the meaning of Title VII. In her Complaint, Logan alleges harassment from Meister concerning the divorce. The alleged harassment consisted of Meister placing his wedding ring on her desk, bringing his new girlfriend to the office, and interfering with Logan's work production, work schedule, and cooperation with co-workers. (Logan Decl. ¶¶ 36−46). Meister allegedly harassed Logan because he wanted her to quit and look bad in front of Barber, not because of her sex. (Logan Dep. at 31:8–11). Therefore, the Court concludes that Logan fails to show that she engaged in protected activity and thus she does not meet the first factor of a prima facie retaliation case. Accordingly, the Court will grant summary judgment as to the retaliation claims.

### 3.    Failure to Accommodate under the ADA

Logan claims that Barber began to revoke her reasonable accommodations in August 2018, around the time Logan began reporting the harassment to Barber. (Logan

Decl. ¶¶ 30–32). Under the ADA, discrimination includes not making reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the business. 42 U.S.C. § 12112(b)(5)(A). A "qualified individual" is a person with a disability, within the meaning of the statute who, with or without reasonable accommodation, can perform the essential functions of the job in question. 42 U.S.C. § 12111(8). Thus, in order to establish a prima facie case of failure to accommodate, a plaintiff must show: (1) that he is an individual who has a disability; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of his job; and (4) that the employer refused to make such accommodations. Rhoads, 257 F.3d at 387 n.11. Ultimately, the plaintiff bears the burden of establishing her ability to perform the essential functions of his job with a reasonable accommodation. Tyndall v. Nat'l Educ. Ctrs, Inc. of Cal., 31 F.3d 209, 213 (4th Cir. 1994).

Estes argues that Logan fails to satisfy the second and fourth factors. (Mot. at 15). In addressing the second element, Estes argues that it did not have notice that Logan had a disability that required an accommodation because she never formally requested an accommodation from Barber or any other individual in a position of management. (Id.). But plaintiffs are "not required to make a formal request to trigger that process." Allen v. Balt. Cnty., 91 F.Supp.3d 722, 733 (D.Md. 2015). "What matters under the ADA [is] . . . whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and

desire for an accommodation." Id. (citing Wilson v. Dollar Gen. Corp., 717 F.3d 337, 347 (4th Cir. 2013)). "A request for accommodation need not, in all cases, be in writing, be made by the employee, or formally invoke the magic words reasonable accommodation." Allen, 91 F.Supp.3d at 733 (quoting Parkinson v. Anne Arundel Med. Ctr., 79 F.App'x 602, 604–05 (4th Cir. 2003) (unpublished) (internal quotation marks omitted)).

In her deposition, Barber testified that "upon hire, [Logan told her] that she had carpal tunnel [syndrome]. (Barber Dep. at 20:1–4). In her self-evaluation report from 2008, which Barber stated in her deposition was her usual practice to review, (id. at 29:1–6), Logan identified her disability as a weakness inhibiting her job performance, (Logan Self Evaluations at 4). In 2013, in another self-evaluation report, Logan noted that her "medical condition prevents [her] from working additional hours at times." (Id. at 1–2). She also reported she experiences physical pain as a result from her work, and that her medical condition negatively affects her goals at work. (Id. at 2). In her personal communications, Logan communicated the details of her disability to Barber. On one such occasion in October 2018, Logan wrote in an email to Barber that her "neck and arm pain are off the charts" after Barber had asked her how she was doing. (Personal Communications at 4). Furthermore, Logan also engaged in performance reviews with Barber where she discussed how her productivity was affected by her disability. (Logan Decl. ¶ 20). Considering this evidence, a reasonable fact finder could conclude that Barber had notice of Logan's disability.

Turning to the fourth factor, however, the record does not show that Barber refused to make such accommodations. Beginning in August 2018, Barber informed Logan that

"she expect[ed] [Logan] physically at the office every Wednesday, Thursday and Friday," and that she wanted Logan "to start coming to the office at 10:00 a.m.," instead of the agreed upon 11:00 a.m. (Logan Decl. ¶¶ 30, 33; see Opp'n at 5). Requiring Logan to be in the office three days a week, which she states in her affidavit is an accommodation that she discussed with Barber after being hired, is not a refusal of an accommodation. (See Logan Decl. ¶ 10). Requiring Logan to arrive to the office one hour earlier does also not convince the Court that Barber refused to accommodate her, especially considering that Logan communicated her acceptance of the schedule change. (Logan Dep. at 10:4–11). Finally, Logan notes that on one occasion she asked to leave the office and work from home due to pain she was experiencing. (Id. at 10:12–16). She claims, however, that Barber told her to use a vacation day. (Id.) Almost immediately after the incident, Logan asked Barber if she could take off the next day due to pain, to which Barber responded that Logan needed to be physically in the office to give out paychecks. (Logan Dep. at 10:17–21). These two incidents occurred successively and they are the only incidents of Estes's alleged denial of accommodations. Logan also does not claim that she protested Barber's instructions or even questioned her. Furthermore, after these incidents, Barber allowed Logan to work from home upon request on several occasions up until just days before her termination. (Reply at 10; Logan Work from Home Requests at 1−3, ECF 60-4). Consequently, Logan's allegations do not convince the Court that Barber refused to accommodate her. Accordingly, the Court will grant the Motion as to Logan's failure to accommodate claim.

### 4. MHWFA Claim

Finally, Logan asserts a claim under the MHWFA alleging Barber knowingly withheld mandated sick leave from her and other employees. (Compl. ¶ 4). Estes argues that Maryland law does not provide a private cause of action for withholding sick leave. (Mot. at 15−16). Under § 3-1308 of the MHWFA, "if an employee believes that an employer has violated this subtitle, the employee may file a written complaint with the Commissioner." Md. Code Ann., Lab. & Empl. § 3-1308. Therefore, the proper way for an individual to pursue a MHWFA claim is through State administrative procedures and not as a claim in federal court. Accordingly, the Court will grant summary judgment as to Logan's MHWFA claim.

### III.   CONCLUSION

For the reasons stated above, the Court will deny Estes's Motion for Summary Judgment as to the discrimination claims and grant summary judgment as to all other claims.

A separate order follows.

Entered this 21st day of March, 2023.

                                                    /s/
                                     George L. Russell, III
                                     United States District Judge